**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| GREGORY MCKENNA, derivatively on behalf of EXELA TECHNOLOGIES, INC., | |
| Plaintiff, | C.A. No. 3:20-cv-1800 |
| vs. | |
| RONALD COGBURN, JAMES G. REYNOLDS, PAR CHADHA, MARTIN AKINS, JOSHUA BLACK, GORDON COBURN, NATHANIEL LIPMAN, MATTHEW NORD, and JOHN H. REXFORD, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| EXELA TECHNOLOGIES, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Gregory McKenna ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Exela Technologies, Inc. ("Exela" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Ronald Cogburn, James G. Reynolds, Par Chadha, Martin Akins, Joshua Black, Gordon Coburn, Nathaniel Lipman, Matthew Nord, and John H. Rexford (collectively, the "Individual Defendants," and together with Exela, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Exela, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based

upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Exela, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Exela's directors and officers from March 16, 2018 through the present (the "Relevant Period").

2.      Based in Irving, Texas, Exela offers software solutions and related services pertaining to transaction processing, enterprise information management, document management, and various other digital business processes.

3.      Prior to, and continuing throughout the Relevant Period, the Company consistently reported material weaknesses in its internal controls, which—as the Individual Defendants conceded—had an appreciable impact on the Company's ability to report wholly accurate financial information. Despite this, the Individual Defendants, including the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), continually certified that the Company's financial reports fairly presented the Company's financial condition and results of operations, and attested that such reports were prepared in accordance with generally accepted accounting principles ("GAAP").

4.      What the Individual Defendants failed to disclose, however, was the true, vast extent of the inaccuracies that plagued the Company's reported financial data. Specifically, as the Individual Defendants would belatedly reveal, from March 2018 through March 2020 at least, the Company repeatedly and substantially misreported many of its most vital financial metrics, including its total revenue and net loss, rendering each of the Company's financial statements filed with the SEC during that period false and misleading. These misstatements were caused by errors in the Company's financial data related to, among other things, liability incurred in connection with a petition for appraisal filed in the Delaware Court of Chancery by former shareholders of the Company's predecessor entity (the "Appraisal Action"), outsourced contract costs, various expense reimbursements, and incorrect recognition of revenue and classification of cash flows.

5.      The truth ultimately began to emerge on March 16, 2020, when the Company announced that it would be unable to timely file its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"), and would be forced to restate certain of its previously issued financial statements (the "Restatement").

6.      On this news, the price of the Company's stock fell by roughly 8%, sinking from $0.185 per share at the close of trading on March 16, 2020, to $0.17 per share at the close of trading on March 17, 2020.

7.      The next day, the Company disclosed additional information regarding the Restatement, revealing that each of the Company's financial statements for the fiscal years ended December 31, 2017 and December 31, 2018, as well as its financial statements issued for the interim periods through September 30, 2019, would need to be restated.

8.      On this news, the price of the Company's stock fell once more, dropping from $0.17 per share at the close of trading on March 17, 2020, to $0.145 per share at the close of trading on March 18, 2020, shedding roughly 14% of its value.

9.      On May 21, 2020, the Company revealed that Defendant James G. Reynolds ("Reynolds") had resigned from his position as the Company's CFO.

10.      On June 9, 2020, the Company at last filed its 2019 10-K, which included the results of the Restatement. The Restatement revealed sweeping corrections to the Company's yearly and quarterly financial data filed with the SEC and issued to the public during fiscal 2019 and 2018, which included millions of dollars in adjustments to the Company's revenue, operating loss, net loss, and other important metrics, laying bare the magnitude of the Individual Defendants' fraudulent misrepresentations.

11.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company's financial data contained a host of serious errors related to the Company's liability in connection with the Appraisal Action, outsourced contract costs, expense reimbursements, revenue recognition, and classification of cash flows, among other things; (2) the foregoing errors negatively impacted the Company's reported revenue, operating loss, net loss, and basic and diluted loss per share; (3) due to the foregoing, the Company's consolidated financial statements for the fiscal years ended December 31, 2017 and December 31, 2018, as well as the Company's quarterly financial data for each fiscal quarter during fiscal 2018, and the

first three fiscal quarters of fiscal 2019 would not be prepared in accordance with GAAP, and could not be relied upon; and (4) as a result, each of the Company's financial statements issued from March 2018 through November 2019 would ultimately need to be restated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

12.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

13.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

14.     Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, certain of the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while one of them engaged in lucrative insider trading, netting proceeds of over $32.8 million. Approximately 2,737,847 shares of the Company's common stock were repurchased between June 2018 and June 2019 for over $10.8 million. As the Company's stock was actually only worth $0.17 per share during that time, the price at closing on March 17, 2020, the Company overpaid by over $10.3 million in total.

15.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's CEO, and the Company's former CFO to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Texas (the "Securities Class Action"), the need to undertake internal investigations,

losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Exela's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

18.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation with headquarters in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

23.     Plaintiff is a current shareholder of Exela common stock. Plaintiff has continuously held Exela common stock at all relevant times.

**Nominal Defendant Exela**

24.     Exela is a Delaware corporation with its principal executive offices located at 2701 E. Grawyler Rd., Irving, Texas 75061. Exela common stock trades on the NASDAQ under the ticker symbol "XELA."

**Defendant Cogburn**

25.     Defendant Ronald Cogburn ("Cogburn") has served as the Company's CEO and as a Company director since July 2017. According to the Company's Form 10-K/A filed with the SEC on June 15, 2020 (the "2019 10-K/A"), as of June 5, 2020, Defendant Cogburn beneficially owned 372,124 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $0.39, Defendant Cogburn owned approximately $145,128 worth of Exela stock.

26.     For the fiscal year ended December 31, 2019, Defendant Cogburn received $1,268,588 in compensation from the Company. This included $325,000 in salary, $98,181 in

option awards, and $845,407 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Cogburn received $1,415,666 in compensation from the Company. This included $325,000 in salary, a $350,000 bonus, $442,520 in stock awards, and $298,146 in option awards.

27.     The Company's 2019 Form 10-K/A stated the following about Defendant Cogburn:

> Business Experience: Mr. Cogburn is our Chief Executive Officer and served as Chief Executive Officer of SourceHOV from 2013 until the closing of the Novitex Business Combination. Mr. Cogburn has been part of companies that were predecessors to SourceHOV since 1993, bringing over 30 years of diversified experience in executive management, construction claims consulting, litigation support, program management project management, cost estimating, damages assessment and general building construction. Mr. Cogburn has also been a principal of HGM since 2003. Prior to his role as Chief Executive Officer of SourceHOV, Mr. Cogburn was SourceHOV's President, KPO from March 2011 to July 2013. Prior to this role, Mr. Cogburn was the President of HOV Services, LLC from January 2005 to September 2007, providing executive leadership during the company's growth to its IPO on the India Stock Exchange in September 2006. Mr. Cogburn has a BSCE in Structural Design/Construction Management from Texas A&M University and is a registered Professional Engineer. We believe that Mr. Cogburn's significant, diversified business experience in Exela's industry make him well-qualified to serve as a director of Exela.

**Defendant Reynolds**

28.     Defendant Reynolds served as the Company's CFO from July 2017 until he resigned on May 15, 2020, and has served as a Company director since July 2017. According to the 2019 10-K/A, as of June 5, 2020, Defendant Reynolds beneficially owned 3,387,782 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $0.39, Defendant Reynolds owned approximately $1.32 million worth of Exela stock.

29.     For the fiscal year ended December 31, 2018, Defendant Reynolds received $1,065,666 in compensation from the Company. This included $325,000 in salary, $442,520 in stock awards, and $298,146 in option awards.

30.     The Company's 2019 Form 10-K/A stated the following about Defendant Reynolds:

> Business Experience: Mr. Reynolds was our Chief Financial Officer from the closing of the Novitex Business Combination until May 2020. Mr. Reynolds served as Co-Chairman of SourceHOV from 2014 until the closing of the Novitex Business Combination in 2017. Mr. Reynolds is also the Chief Operating Officer and a Partner at HGM, bringing over 25 years of industry experience to the team. Prior to HGM Mr. Reynolds held numerous executive management or senior advisory positions at SourceHOV and its related subsidiaries and predecessor companies, including serving as Chief Financial Officer for HOV Services, LLC from 2007 to 2011 and Vice President and Corporate Controller for Lason from 2001 to 2006. Mr. Reynolds was a Senior Manager in the Business Advisory Services Practice at PricewaterhouseCoopers from 1990 to 2001. Mr. Reynolds is a C.P.A. and holds a B.S. in Accounting from Michigan State University. We believe that Mr. Reynold's significant industry and management experience make him well-qualified to serve as a director of the Company.

**Defendant Chadha**

31.     Defendant Par Chadha ("Chadha") has served as the Company's Executive Chairman and as a Company director since July 2017. He also serves as a member of the Company's Nominating and Corporate Governance Committee. According to the 2019 10-K/A, as of June 5, 2020, Defendant Chadha beneficially owned 74,393,234 shares of the Company's common stock. These shares are held by entities affiliated with HandsOn Global Management, LLC ("HGM"), a private equity firm where Defendant Chadha serves as CEO and Chief Investment Officer. Defendant Chadha's beneficial stock ownership provides him with approximately 49.3% of total voting power over matters set for shareholder determination, making him a majority shareholder. Given that the price per share of the Company's common

stock at the close of trading on June 5, 2020 was $0.39, Defendant Chadha owned over $29 million worth of Exela stock.

32.     For the fiscal year ended December 31, 2019, Defendant Chadha received $337,499 in compensation from the Company. This included $197,500 in fees earned or paid in cash and $197,012 in stock awards.

33.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Chadha made the following sale of the Company's common stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 4/16/2018 | 7,000,000 | $4.69 | $32,830,000 |

34.     His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

35.     The Company's 2019 Form 10-K/A stated the following about Defendant Chadha:

Business Experience: Mr. Chadha is our Executive Chairman and is the founder, Chief Executive Officer and Chief Investment Officer of HGM, a family office, formed in 2001, and was the principal stockholder of SourceHOV immediately prior to the July 12, 2017 closing of the Novitex Business Combination Agreement, which resulted in SourceHOV and Novitex becoming our wholly owned subsidiaries. Mr. Chadha also served as Chairman of SourceHOV from 2011 until the closing of the Novitex Business Combination and as Chairman of our Board of Directors from the closing of the Novitex Business Combination until March 27, 2020 when he became our Executive Chairman. Mr. Chadha brings over 40 years of experience in building businesses in the Americas, Europe and Asia, including execution of mergers and acquisitions, integration of businesses and public offerings. Mr. Chadha is a co-founder of Rule 14, LLC, a leading big data mining and automation company formed in 2011, and during his career, Mr. Chadha has founded or co-founded other technology companies in the fields of metro optical networks, systems-on-silicon and communications. Through HGM, Mr. Chadha previously participated in director and executive

roles in joint ventures with major financial and investment institutions, including Apollo, as well as other portfolio companies of HGM, and currently holds and manages investments in evolving financial technology, health technology and communications industries. Since 2005, Mr. Chadha has served as a Director of HOV Services Limited, a company listed on the National Stock Exchange of India, acting as its Chairman from 2009 to 2011. Mr. Chadha holds a B.S. degree in Electrical Engineering from the Punjab Engineering College, India, and completed graduate-level coursework in computer science at the Illinois Institute of Technology. We believe Mr. Chadha's significant experience in the public information technology and business services industry and his experience with mergers and integration of businesses make him well qualified to serve as a director of Exela.

**Defendant Akins**

36.     Defendant Martin Akins ("Akins") has served as a Company director since July 2019. He also serves as a member of the Company's Nominating and Corporate Governance Committee. According to the 2019 10-K/A, as of June 5, 2020, Defendant Akins beneficially owned 76,994 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $0.39, Defendant Akins owned approximately $30,027 worth of Exela stock.

37.     For the fiscal year ended December 31, 2019, Defendant Akins received $250,001 in compensation from the Company. This included $52,989 in fees earned or paid in cash and $197,012 in stock awards.

38.     The Company's 2019 Form 10-K/A stated the following about Defendant Akins:

Business Experience: Mr. Akins most recently served as Senior Vice President, General Counsel and Corporate Secretary of Express Scripts Holding Company, a publicly-traded, Fortune 25 company and the largest independent pharmacy benefit management company in the United States. In this role, Mr. Akins served as the company's chief legal advisor and was also a member of Express Scripts' senior executive team where he advised the CEO, outlined strategy to the Board of Directors and led the company through several, significant strategic transactions. He worked with Express Scripts from February 2001 through March 2019, serving as SVP and General Counsel from October 2015 through the closing of the company's merger with Cigna, Inc. in December of 2018, and remaining with the organization in a transitional role for brief period post-closing.

During his tenure with Express Scripts prior to October 2015, Mr. Akins, served in a variety of legal capacities, including Vice President and Deputy General Counsel, and Associate General Counsel. Before joining Express Scripts, Mr. Akins was with the Polsinelli law firm. Mr. Akins began his legal career with the firm Thompson Coburn LLP. He received his Juris Doctorate from the University of Illinois College of Law. We believe that Mr. Akins' significant, strategic, legal, regulatory and governance experience, make him well-qualified to serve as a director of Exela.

**Defendant Black**

39.     Defendant Joshua Black ("Black") served as a Company director from July 2017 until he resigned on October 28, 2019.

40.     The Company's Schedule 14A filed with the SEC on April 30, 2019 (the "2019 Proxy Statement") stated the following about Defendant Black:

> Business Experience: Joshua Black is a Principal of Apollo Global Management, LLC, where he has been employed since 2011. From 2010 to 2011, Mr. Black was a member of the Leveraged Finance Group of Goldman, Sachs & Co. From 2008 to 2010, Mr. Black was a member of the Financial Institutions Group within the Investment Banking Division of Goldman, Sachs & Co. Mr. Black served as director of Environmental Solutions Worldwide Inc. from January 2011 to March 2015 and Athene USA Corporation from October 1, 2013 to January 22, 2015. Mr. Black currently serves on the board of SCA Acquisition Holdings, LLC (parent of Sun Country Airlines) and Tegra Topco, L.P. Mr. Black graduated cum laude from Princeton University in 2008 with a major in Religion. We believe Mr. Black's significant investment and financial expertise make him well-qualified to serve as a director of Exela.

**Defendant Coburn**

41.     Defendant Gordon Coburn ("Coburn") served as a Company director from July 2017 until he resigned on February 21, 2019.

42.     For the fiscal year ended December 31, 2019, Defendant Coburn received $18,063 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

43.     The Company's Schedule 14A filed with the SEC on May 9, 2018 (the "2018 Proxy Statement") stated the following about Defendant Coburn:

> Mr. Coburn is an Operating Executive for the Carlyle Group, which he joined in December 2017. He has also served as the Executive Chairman of ZeroChaos, LLC since August 2017. Mr. Coburn previously held numerous executive management positions in Cognizant Technology Solutions Corporation, a professional services company, from 1998 to 2016, including serving as President from 2012 to 2016, Chief Operating Officer from 2007 to 2012, Chief Financial Officer and Treasurer from 1998 to 2012, Executive Vice President from 2003 to 2006 and Senior Vice President from 1999 to 2003. Mr. Coburn has served as a director of ProKarm, Inc. since February 2018.

**Defendant Lipman**

44.     Defendant Nathaniel Lipman ("Lipman") served as a Company director from July 2017 until he resigned on October 25, 2019.

45.     For the fiscal year ended December 31, 2019, Defendant Lipman received $334,562 in compensation from the Company. This included $224,563 in fees earned or paid in cash and $109,999 in stock awards.

46.     The Company's 2019 Proxy Statement stated the following about Defendant Lipman:

> Business Experience: Mr. Lipman has held numerous executive management or senior advisory positions in Affinion Group Holdings, Inc., a public company that provides customer engagement and loyalty solutions, and/or its predecessors and subsidiaries, including serving as its Chief Executive Officer from 2005 to 2012 and Executive Chairman of the board of directors from 2012 to November 2015. From November 2015 until March 2018, Mr. Lipman served as a consultant to Affinion Group Holdings, Inc. Since December 2015, Mr. Lipman has served as a Special Advisor to the Chairman of the Upside Travel Group, Inc., a business travel company, where he was a founding member of the Board of Managers. From 1996 to 1999, Mr. Lipman served as Senior Executive Vice President, Corporate Development and Strategic Planning for Planet Hollywood International, Inc., an entertainment and restaurant company. Prior to his tenure at Planet Hollywood, Mr. Lipman was Senior Vice President and General Counsel of House of Blues Entertainment, Inc., an entertainment and restaurant company, Senior Corporate Counsel at The Walt Disney Company, a diversified worldwide entertainment company, and a corporate associate at Skadden, Arps, Slate,

Meagher and Flom, LLP. Mr. Lipman serves on the board of directors of Trusted Media Brands, Inc., Diamond Resorts International and Redbox Automated Holdings, LLC. We believe that Mr. Lipman's significant experience and numerous directorships make him well-qualified to serve as a director of Exela.

**Defendant Nord**

47.    Defendant Matthew Nord ("Nord") served as a Company director from July 2017 until he resigned on October 28, 2019.

48.    The Company's 2019 Proxy Statement stated the following about Defendant Nord:

> Business Experience: Mr. Nord is a Senior Partner at Apollo Private Equity, having joined in 2003. Prior to that time, Mr. Nord was a member of the Investment Banking division of Salomon Smith Barney Inc. Mr. Nord serves on the board of directors of Mount Olympus Holdings, Inc. (parent of West Corporation), Prime Security Services Borrower, LLC. (parent of ADT, Inc.), DSB Parent, L.P. (parent of LifePoint Health, Inexc.) and Presidio, Inc. Mr. Nord also serves on the Board of Trustees of Montefiore Health System and on the Board of Overseers of the University of Pennsylvania's School of Design. Mr. Nord previously served on the boards of directors of Affinion Group Holdings Inc., Constellium N.V., Noranda Aluminum Holding Corporation, and MidCap Financial Holdings, LLC. Mr. Nord graduated summa cum laude with a BS in Economics from the University of Pennsylvania's Wharton School of Business. We believe that Mr. Nord's work at Apollo and his prior experience in investment banking and analyzing, financing and investing in public and private companies makes him well-qualified to serve as a director of Exela.

**Defendant Rexford**

49.    Defendant John H. Rexford ("Rexford") has served as a Company director since July 2017. He also serves as a member of the Company's Compensation Committee and Audit Committee. According to the 2019 10-K/A, as of June 5, 2020, Defendant Rexford beneficially owned 143,648 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 5, 2020 was $0.39, Defendant Rexford owned approximately $56,022 worth of Exela stock.

50.    For the fiscal year ended December 31, 2019, Defendant Rexford received $357,999 in compensation from the Company. This included $248,000 in fees earned or paid in cash and $109,999 in stock awards.

51.    The Company's 2019 Form 10-K/A stated the following about Defendant Rexford:

> Business Experience: Mr. Rexford is the Managing Director of Ramona Park Consulting LLC, which he founded in 2016, and also serves as a director of Verra Mobility. Mr. Rexford has over 36 years of finance experience that includes serving as Global M&A Head from 2010 to 2015 at the Xerox Corporation and serving in various positions at Affiliated Computer Services, Inc. (which was acquired by the Xerox Corporation), including Chief Financial Officer from 2006 to 2007, Executive Vice President from 2001 to 2009 and Senior Vice President of Mergers and Acquisitions from 1996 to 2001. Mr. Rexford holds a B.S. and a MBA from Southern Methodist University. We believe that Mr. Rexford's prior experiences give him an understanding of the business models, structures and attributes of Exela, as well as the risks and operating environment of Exela, which make him well-qualified to serve as a director of Exela.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

52.    By reason of their positions as officers, directors, and/or fiduciaries of Exela and because of their ability to control the business and corporate affairs of Exela, the Individual Defendants owed Exela and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Exela in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Exela and its shareholders so as to benefit all shareholders equally.

53.    Each director and officer of the Company owes to Exela and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

54. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Exela, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

55. To discharge their duties, the officers and directors of Exela were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

56. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Exela, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Exela's Board at all relevant times.

57. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the

Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

58.     To discharge their duties, the officers and directors of Exela were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Exela were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Texas, Delaware, and the United States, and pursuant to Exela's own Global Code of Ethics and Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Exela conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Exela and procedures for the reporting of the business and

internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Exela's operations would comply with all applicable laws and Exela's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

59.     Each of the Individual Defendants further owed to Exela and the shareholders the duty of loyalty requiring that each favor Exela's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

60.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Exela and were at all times acting within the course and scope of such agency.

61.     Because of their advisory, executive, managerial, and directorial positions with Exela, each of the Individual Defendants had access to adverse, non-public information about the Company.

62.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Exela.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

63.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

64.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act.

65.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Exela, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

66.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

67.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Exela and was at all times acting within the course and scope of such agency.

## EXELA'S CODE OF CONDUCT

68.     The Company's Code of Conduct provides that it "applies to all directors, officers and employees of Exela."

69.     In a section titled, "Fair Dealing," the Code of Conduct states the following, in relevant part:

> Each director, officer and employee must deal fairly with Exela's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job. No director, officer or employee may take unfair advantage of anyone through manipulation, concealment, abuse or privileged information, misrepresentation of facts or any other unfair dealing practice.

70.     In a section titled, "Protect Exela Assets," the Code of Conduct provides that "[w]e each have a responsibility to protect company assets and ensure their efficient use. You should use Exela assets only for legitimate business purposes and protect them from loss, theft, misuse and waste."

71.     In a section titled, "Recording and Reporting Information and Records Retention," the Code of Conduct provides that "[a]ll information you record or report on our

behalf, whether for our purposes or for third parties, must be done accurately, completely and honestly."

72.     In a section titled, "Maintaining Accurate Records," the Code of Conduct states the following, in relevant part:

> All of our records (including accounts and financial statements) must be maintained in reasonable and appropriate detail, must be kept in a timely fashion, and must appropriately reflect our transactions. Falsifying records or keeping unrecorded funds and assets is a severe offense and may result in prosecution or loss of employment. When a payment is made, it can only be used for the purpose spelled out in the supporting document.

> As a public company, Exela must follow strict internal control and disclosure procedures but also to generally accepted accounting principles and other laws and regulations.

> Our internal and external auditing functions are designed to ensure that our financial books, records and accounts are accurate. Therefore, you should provide our accounting department, internal auditing staff, audit committee and independent public accountants with all pertinent information that they may request. We encourage open lines of communication with our Audit Committee, accountants and auditors and require that all our personnel cooperate with them to the maximum extent possible. It is unlawful for you to fraudulently influence, induce, coerce, manipulate or mislead our independent public accountants for the purpose of making our financial statements misleading.

73.     In a section titled, "Disclosure," the Code of Conduct states the following:

> Exela's periodic reports and other documents filed with the Securities and Exchange Commission ("SEC"), including all financial statements and other financial information, must comply with applicable U.S. federal securities laws and SEC and Nasdaq rules.

> Each director, officer and employee must cooperate fully with Exela's accounting and internal audit departments, as well as Exela's independent public accountants and counsel.

> Each director, officer and employee who is involved in Exela's disclosure process must:

> - be familiar with and comply with Exela's disclosure controls and procedures, its internal control over financial reporting and the Corporate Communications Policy; and

- take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of Exela provide full, fair, accurate, timely and understandable disclosure.

74.     In a section titled, "Insider Trading Policy," the Code of Conduct states the following, in relevant part:

> Trading on inside information is a violation of securities law. Employees in possession of material non-public information about Exela or companies with whom we do business must abstain from trading or advising others to trade in the respective company's securities from the time that they obtain such inside information until adequate public disclosure of the information. Material information is information of such importance that it can be expected to affect the judgment of investors as to whether or not to buy, sell, or hold the securities in question. To use non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal.

75.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act. Additionally, one of the Individual Defendants violated the Code of Conduct by selling shares of Company stock while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

76.     Exela is a Texas-based technology company that provides software solutions and related services pertaining to transaction processing, enterprise information management, document management, and other digital business processes.

77.     The Company's business is organized into three segments: (1) Information & Transaction Processing Solutions, which provides information capture and processing services to customers in the commercial, financial services, and legal industries; (2) Healthcare Solutions, which provides consulting services to customers in the healthcare provider and payer markets; and (3) Legal & Loss Prevention Services, which provides support services to corporate counsel, government counsel, and law firms in connection with bankruptcy and labor litigation and other legal matters.

78.     Under applicable SEC rules and regulations, public companies, such as Exela, are required to file financial statements that are prepared in accordance with GAAP. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements that are not in compliance with GAAP are to be presumed misleading by the SEC.

79.     As the Company revealed in its 2019 10-K, and as described in greater detail below, throughout the Relevant Period, the Individual Defendants misstated many of the Company's most important financial metrics, including the Company's total revenue and net loss, in violation of GAAP. These misstatements were caused by errors related to, among other things, liability incurred by the Company in connection with the Appraisal Action, outsourced contract costs, various expense reimbursements, and incorrect recognition of revenue and classification of cash flows.

80.     These and other misstatements were concealed from the investing public for approximately *two years*, before the Individual Defendants were ultimately forced to reveal the extent of their misrepresentations in March 2020.

**Materially False and Misleading Statements**

***March 16, 2018 Form 10-K***

81.     On March 16, 2018, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Cogburn, Reynolds, Chadha, Black, Coburn, Lipman, Nord, and Rexford, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Cogburn and Reynolds attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

82.     The 2017 10-K reported, *inter alia*, revenue of $1,152,324,000, operating loss of $99,532,000, net loss of $204,285,000, and basic and diluted loss per share of $2.08 for the fiscal year ended December 31, 2017.

83.     Additionally, the 2017 10-K reported $104,485,000 and $10,000,000 in accrued liabilities and total stockholders' deficit, respectively, $23,455,000 in net cash provided by (used in) operating activities, $452,374,000 in net cash provided by (used in) investing activities, and $475,727,000 in net cash provided by (used in) financing activities for the fiscal year ended December 31, 2017.

84.     As revealed in the Company's Restatement, the 2017 10-K overstated the Company's revenue by $6,433,000, and understated its operating loss by $4,834,000, its net loss

by \$5,199,000, and its diluted loss per share by \$0.10 for the fiscal year ended December 31, 2017.

85.     The 2017 10-K also understated the Company's accrued liabilities and total stockholders' deficit by \$37,800,000 and its net cash provided by (used in) operating activities by \$28,322,000, and overstated the Company's net cash provided by (used in) investing activities by \$10,992,000 and its net cash provided by (used in) financing activities by \$39,314,000 for the fiscal year ended December 31, 2017.

86.     With respect to the Company's compliance with GAAP, the 2017 10-K stated the following:

> The accompanying consolidated financial statements and related notes to the consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States ("U.S. GAAP") and in accordance with the rules and regulations of the Securities and Exchange Commission ("SEC"). The consolidated financial statements reflect all normal and recurring adjustments that are, in the opinion of the Company's management, necessary for the fair presentation of the results of operations for the period.

### May 9, 2018 Proxy Statement

87.     On May 9, 2018, the Company filed the 2018 Proxy Statement with the SEC. Defendants Cogburn, Reynolds, Chadha, Black, Coburn, Lipman, Nord, and Rexford solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

88.     The 2018 Proxy Statement was false and misleading because, despite noting that the Company maintained certain governance guidelines and procedures, such procedures, including the Code of Conduct, were not followed, as evidenced by the numerous false and

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

89.     The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company's financial data contained a host of serious errors related to the Company's liability in connection with the Appraisal Action, outsourced contract costs, expense reimbursements, revenue recognition, and classification of cash flows, among other things; (2) the foregoing errors negatively impacted the Company's reported revenue, operating loss, net loss, and basic and diluted loss per share; (3) due to the foregoing, the Company's consolidated financial statements for the fiscal years ended December 31, 2017 and December 31, 2018, as well as the Company's quarterly financial data for each fiscal quarter during fiscal 2018, and the first three fiscal quarters of fiscal 2019 would not be prepared in accordance with GAAP, and could not be relied upon; and (4) as a result, each of the Company's financial statements issued from March 2018 through November 2019 would ultimately need to be restated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *May 10, 2018 Form 10-Q*

90.     On May 10, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendants Cogburn and Reynolds, and contained SOX certifications signed by Defendants Cogburn and Reynolds attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

91.     The 1Q18 10-Q reported, *inter alia*, operating loss of $14,656,000 for the fiscal quarter ended March 31, 2018.

92.     As revealed in the Company's Restatement, the 1Q18 10-Q understated the Company's operating loss by approximately $675,000 for the fiscal quarter ended March 31, 2018.

93.     With respect to the Company's compliance with GAAP, the 1Q18 10-Q stated the following:

> The accompanying condensed consolidated financial statements have been prepared using accounting principles generally accepted in the United States of America ("GAAP") and with the instructions to Form 10-Q and Rule 10-01 of Securities and Exchange Commission ("SEC") Regulation S-X as they apply to interim financial information.

### August 9, 2018 Form 10-Q

94.     On August 9, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendants Cogburn and Reynolds, and contained SOX certifications signed by Defendants Cogburn and Reynolds attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

95.     The 2Q18 10-Q reported, *inter alia*, operating income of $11,935,000 and net loss of $25,182,000 for the fiscal quarter ended June 30, 2018.

96.     As revealed in the Company's Restatement, the 2Q18 10-Q understated the Company's operating loss by approximately $19,245,000 and net loss by approximately $5,327,000 for the fiscal quarter ended June 30, 2018.

97.     With respect to the Company's compliance with GAAP, the 2Q18 10-Q stated the following:

> The accompanying condensed consolidated financial statements have been prepared using accounting principles generally accepted in the United States of

America ("GAAP") and with the instructions to Form 10-Q and Rule 10-01 of Securities and Exchange Commission ("SEC") Regulation S-X as they apply to interim financial information.

**November 8, 2018 Form 10-Q**

98.     On November 8, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Cogburn and Reynolds, and contained SOX certifications signed by Defendants Cogburn and Reynolds attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

99.     The 3Q18 10-Q reported, *inter alia*, operating income of $6,381,000 for the fiscal quarter ended September 30, 2018.

100.     As revealed in the Company's Restatement, the 3Q18 10-Q understated the Company's operating loss by approximately $13,644,000 for the fiscal quarter ended September 30, 2018.

101.     With respect to the Company's compliance with GAAP, the 3Q18 10-Q stated the following:

> The accompanying condensed consolidated financial statements have been prepared using accounting principles generally accepted in the United States of America ("GAAP") and with the instructions to Form 10-Q and Rule 10-01 of Securities and Exchange Commission ("SEC") Regulation S-X as they apply to interim financial information.

**March 20, 2019 Form 10-K**

102.     On March 20, 2019, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Cogburn, Reynolds, Chadha, Black, Lipman, Nord, and Rexford, and contained SOX

certifications signed by Defendants Cogburn and Reynolds attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

103.    The 2018 10-K reported, *inter alia*, operating loss of $6,249,000, net loss of $,162,517,000, and basic and diluted loss per share of $1.09 for the fiscal year ended December 31, 2018.

104.    Additionally, the 2018 10-K reported $66,008,000 and $181,006 in accrued liabilities and total stockholders' deficit, respectively, $6,710,000 in related party payables, $184,651,000 in selling, general, and administrative expenses, $30,457,000 in net cash provided by (used in) operating activities, $66,304,000 in net cash provided by (used in) investing activities, and $1,910,000 in net cash provided by (used in) financing activities for the fiscal year ended December 31, 2018.

105.    As revealed in the Company's Restatement, the 2018 10-K understated the Company's operating loss by $4,447,000, its net loss by $7,289,000, and its diluted loss per share by $0.08 for the fiscal year ended December 31, 2018.

106.    The 2018 10-K also understated the Company's accrued liabilities and total stockholders' deficit $40,600,000 and its related party payables by $2,400,000, and overstated the Company's selling, general, and administrative expenses by $400,000, its net cash provided by (used in) operating activities by $6,857,000, its net cash provided by (used in) investing activities by $7,552,000, and its net cash provided by (used in) financing activities by $695,000 for the fiscal year ended December 31, 2018.

107.    With respect to the Company's compliance with GAAP, the 2018 10-K stated the following:

> The accompanying consolidated financial statements and related notes to the consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States ("U.S. GAAP") and in accordance with the rules and regulations of the Securities and Exchange Commission ("SEC").

### April 30, 2019 Proxy Statement

108.    On April 30, 2019, the Company filed the 2019 Proxy Statement with the SEC. Defendants Cogburn, Reynolds, Chadha, Black, Lipman, Nord, and Rexford solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

109.    The 2019 Proxy Statement was false and misleading because, despite noting that the Company maintained certain governance guidelines and procedures, such procedures, including the Code of Conduct, were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

110.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company's financial data contained a host of serious errors related to the Company's liability in connection with the Appraisal Action, outsourced contract costs, expense reimbursements, revenue recognition, and classification of cash flows, among other things; (2) the foregoing errors negatively impacted the Company's reported revenue, operating loss, net loss, and basic and diluted loss per share; (3) due to the foregoing, the Company's consolidated financial

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

statements for the fiscal years ended December 31, 2017 and December 31, 2018, as well as the Company's quarterly financial data for each fiscal quarter during fiscal 2018, and the first three fiscal quarters of fiscal 2019 would not be prepared in accordance with GAAP, and could not be relied upon; and (4) as a result, each of the Company's financial statements issued from March 2018 through November 2019 would ultimately need to be restated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### May 10, 2019 Form 10-Q

111.    On May 10, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Cogburn and Reynolds, and contained SOX certifications signed by Defendants Cogburn and Reynolds attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

112.    The 1Q19 10-Q reported, *inter alia*, operating income of $17,920,000 and net loss of $29,907,000 for the fiscal quarter ended March 31, 2019.

113.    As revealed in the Company's Restatement, the 1Q19 10-Q understated the Company's operating loss by approximately $34,477,000 and net loss by approximately $2,265,000 for the fiscal quarter ended March 31, 2019.

114.    With respect to the Company's compliance with GAAP, the 1Q19 10-Q stated the following:

> The accompanying condensed consolidated financial statements have been prepared using accounting principles generally accepted in the United States of America ("GAAP") and with the instructions to Form 10-Q and Rule 10-01 of Securities and Exchange Commission ("SEC") Regulation S-X as they apply to interim financial information.

*August 8, 2019 Form 10-Q*

115.     On August 8, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Cogburn and Reynolds, and contained SOX certifications signed by Defendants Cogburn and Reynolds attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

116.     The 2Q19 10-Q reported, *inter alia*, operating income of $12,344,000 and net loss of $34,146,000 for the fiscal quarter ended June 30, 2019.

117.     As revealed in the Company's Restatement, the 2Q19 10-Q understated the Company's operating loss by approximately $18,090,000 and net loss by approximately $7,425,000 for the fiscal quarter ended June 30, 2019.

118.     With respect to the Company's compliance with GAAP, the 2Q19 10-Q stated the following:

> The accompanying condensed consolidated financial statements have been prepared using accounting principles generally accepted in the United States of America ("GAAP") and with the instructions to Form 10-Q and Rule 10-01 of Securities and Exchange Commission ("SEC") Regulation S-X as they apply to interim financial information.

*November 12, 2019 Form 10-Q*

119.     On November 12, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendants Cogburn and Reynolds, and contained SOX certifications signed by Defendants Cogburn and Reynolds attesting to the accuracy of the financial statements contained therein, the

disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

120.   The 3Q19 10-Q reported, *inter alia*, revenue of $1,166,841,000, operating loss of $66,615,000, net loss of $197,479,000, and basic and diluted loss per share of $1.33 for the nine-month period ended September 30, 2019.

121.   Additionally, the 3Q19 10-Q reported $60,994,000 and $373,311,000 in accrued liabilities and total stockholders' deficit, respectively, $274,000 in related party payables, $151,884,000 in selling, general, and administrative expenses, $33,639,000 in net cash provided by (used in) operating activities, $34,815,000 in net cash provided by (used in) investing activities, and $39,854,000 in net cash provided by (used in) financing activities for the nine-month period ended September 30, 2019.

122.   As revealed in the Company's Restatement, the 3Q19 10-Q overstated the Company's revenue by $1,910,000, and understated the Company's operating loss by $5,096,000, its net loss by $7,554,000, and its diluted loss per share by $0.10 for the nine-month period ended September 30, 2019.

123.   The 3Q19 10-Q also understated the Company's accrued liabilities and total stockholders' deficit by $43,100,000, its related party payables by $2,100,000, and its net cash provided by (used in) operating activities by $13,718,000, and overstated the Company's selling, general, and administrative expenses by $500,000, its net cash provided by (used in) investing activities by $14,304,000, and its net cash provided by (used in) financing activities by $586,000 for the nine-month period ended September 30, 2019.

124.   With respect to the Company's compliance with GAAP, the 3Q19 10-Q stated the following:

The accompanying condensed consolidated financial statements have been prepared using accounting principles generally accepted in the United States of America ("GAAP") and with the instructions to Form 10-Q and Rule 10-01 of Securities and Exchange Commission ("SEC") Regulation S-X as they apply to interim financial information.

125.    The statements in ¶¶ 81–83, 86, 90–91, 93–95, 97–99, 101–104, 107, 111–112, 114–116, 118–121, and 124 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants failed and/or caused the Company to fail to disclose, *inter alia*, that: (1) the Company's financial data contained a host of serious errors related to the Company's liability in connection with the Appraisal Action, outsourced contract costs, expense reimbursements, revenue recognition, and classification of cash flows, among other things; (2) the foregoing errors negatively impacted the Company's reported revenue, operating loss, net loss, and basic and diluted loss per share; (3) due to the foregoing, the Company's consolidated financial statements for the fiscal years ended December 31, 2017 and December 31, 2018, as well as the Company's quarterly financial data for each fiscal quarter during fiscal 2018, and the first three fiscal quarters of fiscal 2019 would not be prepared in accordance with GAAP, and could not be relied upon; and (4) as a result, each of the Company's financial statements issued from March 2018 through November 2019 would ultimately need to be restated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

126.    On March 16, 2020, the Company issued a press release revealing that the Company would be unable to timely file its 2019 10-K due to the need to restate certain of the Company's previously issued financial statements. Consequently, the Company would be

delaying its earnings call scheduled to discuss the Company's financial results for the fiscal year. The press release stated the following, in relevant part:

> IRVING, Texas, March 16, 2020 (GLOBE NEWSWIRE) -- Exela Technologies, Inc. ("Exela" or the "Company") (NASDAQ: XELA), a location-agnostic global business process automation ("BPA") leader across numerous industries, announced today that it will delay its earnings release and investor conference call for the fourth quarter and year ended December 31, 2019, previously scheduled for 5:00 p.m. (ET) today. Exela has postponed its earnings release and conference call due to the delayed filing of its Form 10-K for the year-ended December 31, 2019, and the need to restate certain of its historical financial statements.
>
> Exela plans to file a Form 12b-25, Notification of Late Filing, with the Securities and Exchange Commission, by March 17, 2020, which will provide the Company with a 15 calendar-day extension beyond the March 16, 2020 deadline within which to file the 2019 annual report on Form 10-K. Exela also plans to file a Form 8-K with the SEC on March 17, 2020, with additional details regarding the restatement of its historical financial statements.
>
> Exela currently expects to file the Company's Form 10-K for the year-ended December 31, 2019, on or before March 31, 2020. Once that date is finalized, Exela will schedule an investor conference call to discuss the financial results for the fourth quarter and full year 2019. Although Exela is working diligently to complete the 2019 Form 10-K, and currently expects to complete and file these items by March 31, 2020, given factors such as potential work interruptions associated with the COVID-19 coronavirus, no assurance can be given that they will be filed within such period.

127.    On this news, the price of the Company's stock fell from $0.185 per share at the close of trading on March 16, 2020, to $0.17 per share at the close of trading on March 17, 2020, representing a loss in value of approximately 8%.

128.    Then, on March 17, 2020, the Company issued a press release disclosing more information regarding the delayed 2019 10-K and the Restatement as follows:

> IRVING, Texas, March 17, 2020 (GLOBE NEWSWIRE) -- Exela Technologies, Inc. ("Exela" or the "Company") (NASDAQ: XELA), a location-agnostic global business process automation ("BPA") leader across numerous industries, today filed with the Securities and Exchange Commission on Form 12b-25, *a Notification of Late Filing, for its 10-K for the year ended December 31, 2019, and on Form 8-K, details regarding the restatement of its financial statements for the years ended December 31, 2017 and 2018, and the interim periods*

*through September 30, 2019 as previously disclosed on March 16, 2020*. The restatement is not expected to have a material impact on previously reported Revenue or Adjusted EBITDA.

In addition, the Company noted that as of March 16, 2020, it had cash on hand and available borrowings of approximately $100 million, and reaffirmed its full year 2019 guidance for Revenue and Adjusted EBITDA issued on November 12, 2019.

Exela currently expects to file the Company's Form 10-K for the year-ended December 31, 2019, and restated financial statements for 2017 and 2018 and the interim periods through September 30, 2019, on or before March 31, 2020. The Company also plans to release its full fourth quarter 2019 financial results concurrently with such filing. Once that date is finalized, Exela will schedule an investor conference call to discuss the financial results for the fourth quarter and full year 2019. Although Exela is working diligently to complete the 2019 Form 10-K, and restatements of its financial statements for 2017 and 2018 and the interim periods through September 30, 2019, and currently expects to complete and file these items by March 31, 2020, given factors such as potential work interruptions associated with the COVID-19 coronavirus, no assurance can be given that they will be filed within such period.

(Emphasis added.)

129.     That same day, the Company filed a notification of late filing on Form 12b-25

with the SEC, which stated the following, in relevant part:

As reported in its Form 8-K filed with the Securities and Exchange Commission on March 17, 2020 (the "Form 8-K"), Exela Technologies, Inc. (the "Company") *has determined that it will restate its financial statements for the years ended December 31, 2017 and 2018 and the interim periods through September 30, 2019 (which will be addressed in the Company's Form 10-K for the year ended December 31, 2019 (the "Form 10-K")) to correct certain historical accounting errors. We have determined that these errors were the result of a material weakness in internal control over financial reporting that was previously reported in management's most recently issued report on internal control over financial reporting that continued to exist as of December 31, 2019*. As of March 16, 2020, the Company had cash on hand and available borrowings of approximately $100 million. The Company's projected liquidity through the first quarter of 2021, determined without giving effect to certain projected operational savings that the Company currently expects to achieve and considering the timing of potential payments related to the Appraisal Action, results in the Company needing additional time to complete the evaluation of its ability to continue as a going concern as part of the completion of its financial statements and related disclosures, including the restatement of previously issued financial statements.

> As a result, the preparation of the financial statements to be included in the Form 10-K and the related audit of such financial statements have not been completed. Although the Company is seeking to complete this process as quickly as possible, the preparation of the financial statements and audit cannot be completed within the prescribed time period for filing the Form 10-K without unreasonable effort or expense.

(Emphasis added.)

130.    On this news, the price of the Company's stock fell from $0.17 per share at the close of trading on March 17, 2020, to $0.145 per share at the close of trading on March 18, 2020, representing a loss in value of approximately 14%.

131.    Not long after, on May 21, 2020, the Company announced that Defendant Reynolds had stepped down from his position as the Company's CFO, effective May 15, 2020.

132.    The Company ultimately filed its 2019 10-K on June 9, 2020, which revealed the full extent of the Restatement, stating the following:

> As previously disclosed in the Company's Current Report on Form 8-K filed with the SEC on March 17, 2020, the board of directors of the Company, based on the recommendation of the audit committee and in consultation with management, concluded that, because of errors identified in the Company's previously issued financial statements for the fiscal years ended December 31, 2018 and 2017 and the first three quarters of fiscal 2019, the Company would restate its previously issued financial statements, including the quarterly data for fiscal years 2019 and 2018 and its selected financial data for the relevant periods.
>
> These errors were discovered during the course of preparing this Annual Report and the audit of the financial results for fiscal 2019. We have determined that these errors were the result of material weaknesses in internal control over financial reporting that are reported in management's report on internal control over financial reporting as of December 31, 2019 in Part II—Item 9A – Controls and Procedures of this Annual Report.

133.    The 2019 10-K described corrections to various misstatements in the Company's previously issued financial statements pertaining to, *inter alia*, the Company's liability in connection with the Appraisal Action, outsourced contract costs, expense reimbursements, revenue recognition, and classification of cash flows as follows:

*(a)*     Appraisal Action Liability Adjustments:

During the fourth quarter of fiscal 2019, the Company identified an error as a result of non-accrual of liability and interest thereon for the obligation to pay the fair market value of the shares of certain former stockholders of SourceHOV under the Appraisal Action. As previously reported, on September 21, 2017, former stockholders of SourceHOV, who owned 10,304 shares of SourceHOV common stock, filed a petition for Appraisal Action arising out of the Novitex Business Combination. In the Appraisal Action, the petitioners sought, among other things, a determination of the fair value of their shares at the time of the Novitex Business Combination; an order that SourceHOV pay that value to the petitioners, together with interest at the statutory rate; and an award of costs, attorneys' fees, and other expenses. The parties and their experts offered competing valuations of the SourceHOV shares as of the date of the Novitex Business Combination. On January 30, 2020, the Court issued its post-trial Memorandum Opinion in the Appraisal Action, in which it found that the fair value of SourceHOV as of the Closing Date was $4,591 per share, and on March 26, 2020, the Court issued its final order and judgment awarding the petitioners $57,698,426 inclusive of costs and interest. Per the Court's opinion, the legal rate of interest, compounded quarterly, accrues on the per share value from the Closing Date until the date of payment to petitioners. As a result of the Appraisal Action, 4,570,734 shares of our Common Stock issued to Ex-Sigma 2, our principal stockholder at the Closing of the Novitex Business Combination, have been returned to the Company during the first quarter of 2020. Interest accrues on the value of the shares from the date of the Business Combination until the liability is paid. Until the third quarter of 2019, the Company had included a disclosure on the Appraisal Action as a part of the Commitment and Contingencies footnote in its consolidated financial statements but had not recorded a liability or accrued interest thereon for the obligation. After evaluating the historical accounting treatment applied to the Appraisal Action, the Company has determined that its historical accounting was in error and the obligation to pay the fair market value of the former stockholders' shares represented an obligation as of the date the Appraisal Action was submitted in September 2017. The liability should have been recorded in 2017 at the estimated fair value of the shares tendered. This error resulted in $43.1 million, $40.6 million and $37.8 million understatement of accrued liabilities and commensurate understatement of total stockholders' deficit, as at September 30, 2019, December 31, 2018 and 2017, respectively. Further, this error resulted in $2.4 million, $2.9 million and $1.2 million understatement of loss for the nine months ended September 30, 2019 and for the years ended December 31, 2018 and 2017, respectively, due to the unrecorded interest expense accrual associated with the Company's obligations related to the Appraisal Action. Interest should have been accrued in the relevant periods at the rate set by the Delaware Court of Chancery. The correction of this error also reduced the number of shares outstanding by 4,570,734 shares for purposes of the weighted average outstanding common shares computation used to calculate basic and diluted loss per share during the respective periods. These are the number of shares of our Common Stock issued at the Closing of the Novitex Business Combination to Ex-Sigma 2 in respect of the former stockholders' shares subject to the Appraisal Action that were returned to the Company during the first quarter of 2020.

*(b)*     Outsourced Contract Cost Adjustments:

A $5.3 million understatement of loss for the nine months ended September 30, 2019 and a $3.2 million overstatement of loss for the year ended December 31, 2018, due to incorrect capitalization of employee training related costs during the set-up phase as costs of fulfilling contracts which should have been expensed under ASC 340-40. Additionally, an adjustment of $15.4 million was recorded to increase accumulated deficit as of January 1, 2018 to correct the previously-recorded transition adjustment for costs of fulfilling contracts upon the adoption of ASC 606 and ASC 340-40. These errors resulted in $17.3 million and $12.0 million overstatement of intangible assets, net as of September 30, 2019 and December 31, 2018, respectively.

*(c)*      Other Misstatement Adjustments

*Expense Reimbursement Adjustments:*

During the second half of 2019, we reimbursed Ex-Sigma 2 approximately $4.5 million in total, out of that $2.1 million of underwriting discount and commission expenses and $0.3 million of advisory fee were incurred by Ex-Sigma 2 in a secondary offering in April 2018 and $2.1 million of expenses related to the discount to the market price on shares sold by Ex-Sigma 2 in a secondary offering in June 2019 and required to be reimbursed pursuant to the terms of the Consent, Waiver and Amendment, amending the Novitex Business Combination Agreement, dated February 21, 2017. Approximately $2.4 million and $2.1 million of these expenses should have been recorded in the 2018 and the second quarter of 2019, respectively. This error resulted in a $2.1 million and $2.4 million understatement of loss for the quarter ended June 30, 2019 and for the year ended December 31, 2018, respectively.

Further, $1.5 million paid to Ex-Sigma 2 in July 2019 for the fees incurred in connection with the secondary offering, out of total reimbursement of $4.5 million in the second half of 2019 as discussed above, was erroneously recorded as selling, general and administrative expenses in the third quarter of 2019. This error resulted in a $1.5 million overstatement of loss for the third quarter of 2019.

Additionally, the Company did not record related party expense accrual associated with the Company's obligation to reimburse Ex-Sigma 2 in connection with premium payments made by Ex-Sigma 2 under the Margin Loan and required to be reimbursed pursuant to the terms of the Consent, Waiver and Amendment. It resulted in a $1.7 million and $5.2 million understatement of loss for the nine months ended September 30, 2019 and for the year ended December 31, 2018.

The above errors, together, resulted in an understatement of related party payables by $5.0 million as of the reported interim quarters ended June 30, 2018 and September 30, 2018; an understatement of related party payables by $7.6 million as of the year ended December 31, 2018 and the reported interim quarter ended

March 31, 2019; and an understatement of related party payables by $11.4 million and $9.9 million as of the quarters ended June 30, 2019 and September 30, 2019, respectively.

The Company incorrectly classified $0.5 million and $0.4 million of related party expense as selling, general and administrative expenses for the nine months ended September 30, 2019 and for the year ended December 31, 2018, respectively. This resulted in an overstatement of selling, general and administrative expenses and understatement of related party expense. This error had no impact on net loss.

*Revenue Recognition Adjustments:*

A $4.8 million understatement of loss, for the year ended December 31, 2017, was due to incorrect recognition of revenue of $6.4 million and related cost of revenue of $1.6 million in 2017 related to a multiple element arrangement that included a software license where vendor specific objective evidence (VSOE) of fair value was not established for the undelivered elements of the arrangement under the previous revenue recognition guidance in ASC 985-605. This error resulted in a $6.4 million understatement of deferred revenue and a $1.6 million understatement of prepaid expenses and other current assets as at December 31, 2017. After correction of this error in the fiscal 2017 financial statements, the Company derecognized this deferred revenue of $6.4 million and prepaid expenses and other current assets of $1.6 million, resulting in net increase in the retained earnings of $4.8 million on adoption of ASC 606 and ASC 340-40 on January 1, 2018.

Further, a $1.9 million understatement of revenues and understatement of cost of revenue by the same amount for the nine months ended September 30, 2019, were due to incorrect application of the gross vs. net presentation guidance under ASC 606. The Company incorrectly netted the costs of rendering service from the revenue under a contract with one customer. This error had no impact on net loss.

*Cash Flows Classification Adjustments:*

The Company determined that operating cash flows were understated and financing cash flows overstated in the statement of cash flows by $0.1 million and $34.5 million for the years ended December 31, 2018 and 2017, respectively, as a result of the incorrect interpretation of ASU 2016-15 (*Classification of Certain Receipts and Cash Payments*) and application on a retrospective basis upon adoption of ASU 2016-15 in 2018. Further, the Company determined that operating cash flows were overstated and investing cash flows understated in the statement of cash flows by $14.3 million, $7.5 million and $11.0 million for the nine months ended September 30, 2019 and for the years ended December 31, 2018 and 2017, respectively, as a result of misclassification of cash flows associated with outsourced contract costs.

*Other Adjustments:*

In addition to the errors described above, the restated financial statements also include adjustments to correct certain other immaterial errors, including previously unrecorded immaterial adjustments identified in audits of prior years' financial statements.

134.   The 2019 10-K also contained the following tables disclosing the impact of the above-described corrections to the Company's previously reported net loss and revenue, among other things:

| | Appraisal Action Liability Adjustments | Outsourced Contract Cost Adjustments | Expense Reimbursement Adjustment | Revenue Recognition Adjustment | Other Adjustment | Tax Effect of Adjustments | Total Increase in Net Loss |
|---|---|---|---|---|---|---|---|
| Year Ended December 31, 2017 | $ 1,187 | $ — | $ 7,628 | $ 4,834 | $ — | $ (823) | $ 5,199 |
| Year Ended December 31, 2018 | 2,896 | (3,196) | — | — | 15 | (54) | 7,289 |
| Nine Months Ended September 30, 2019 | 2,457 | 5,330 | 2,304 | (1,910) | (628) | — | 7,553 |
| | $ 6,540 | $ 2,134 | $ 9,932 | $ 2,924 | $ (613) | $ (876) | $ 20,041 |

\* \* \*

\* \* \*

| (in thousands) | | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 | Year Ended December 31, 2017 |
|---|---|---|---|---|
| **Net cash provided by (used in) operating activities** | As Originally Reported | $ (33,639) | $ 30,457 | $ 23,455 |
| | Adjustments | (13,718) | (6,857) | 28,322 |
| | As Restated | $ (47,357) | $ 23,600 | $ 51,777 |
| **Net cash provided by (used in) investing activities** | As Originally Reported | $ (34,815) | $ (66,304) | $ (452,374) |
| | Adjustments | 14,304 | 7,552 | 10,992 |
| | As Restated | $ (20,511) | $ (58,752) | $ (441,382) |
| **Net cash provided by (used in) financing activities** | As Originally Reported | $ 39,854 | $ (1,910) | $ 475,727 |
| | Adjustments | (586) | (695) | (39,314) |
| | As Restated | $ 39,268 | $ (2,605) | $ 436,413 |
| | | $ (71,711) | $ (10,696) | $ (104,366) |
| **Net loss** | As Originally Reported | $ (197,479) | $ (162,517) | $ (204,285) |
| | Adjustments | (7,553) | (7,289) | (5,199) |
| | As Restated | $ (205,032) | $ (169,806) | $ (209,484) |
| **Basic and diluted loss per share** | As Originally Reported | $ (1.33) | $ (1.09) | $ (2.08) |
| | Adjustments | (0.10) | (0.08) | (0.10) |
| | As Restated | $ (1.43) | $ (1.17) | $ (2.18) |

135.   Lastly, the 2019 10-K provided the following data regarding corrections to the Company's quarterly financial results provided during fiscal 2019 and 2018, respectively:

| | Q1 2019 (As Restated) | Q2 2019 (As Restated) | Q3 2019 (As Restated) | Q4 2019 |
|---|---|---|---|---|
| **Revenue:** | | | | |
| ITPS | $   325,172 | $   309,840 | $   292,607 | $   306,665 |
| HS | 61,343 | 63,440 | 62,132 | 69,806 |
| LLPS | 17,842 | 17,569 | 18,806 | 17,115 |
| Total Revenue | 404,357 | 390,849 | 373,545 | 393,586 |

\* \* \*

| | | | | |
|---|---|---|---|---|
| **Net loss** | (32,172) | (41,571) | (131,289) | (304,084) |
| **Operating income (loss)** | 16,457 | 5,746 | (93,914) | (249,512) |

\* \* \*

| | Q1 2018 (As Restated) | Q2 2018 (As Restated) | Q3 2018 (As Restated) | Q4 2018 (As Restated) |
|---|---|---|---|---|
| **Revenue:** | | | | |
| ITPS | $   311,936 | $   330,131 | $   307,313 | $   324,267 |
| HS | 58,632 | 56,314 | 56,776 | 56,293 |
| LLPS | 22,599 | 23,937 | 18,941 | 19,083 |
| Total Revenue | 393,167 | 410,382 | 383,030 | 399,643 |

\* \* \*

\* \* \*

| | | | | |
|---|---|---|---|---|
| **Net loss** | (23,978) | (30,509) | (28,806) | (86,513) |

\* \* \*

| | | | | |
|---|---|---|---|---|
| **Operating income (loss)** | 15,331 | 7,310 | 7,263 | (40,600) |

## Repurchases

136.   During the period in which the Company made false and misleading statements and/or omissions, Defendants Cogburn, Reynolds, Chadha, Black, Coburn, Lipman, Nord, and Rexford caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $10.8 million to repurchase approximately 2,737,847 shares of its own common stock at artificially inflated prices.

137.    According to the 2019 10-K, during the fiscal quarter ended June 30, 2018, the Company purchased 768,693 shares of its common stock for approximately $3,735,847, at an average price of $4.86 per share.

138.    As the Company's stock was actually worth only $0.17 per share, the price at closing on March 17, 2020, the Company overpaid by approximately $3,605,169 for repurchases of its own stock during the fiscal quarter ended June 30, 2018.

139.    According to the 2019 10-K, during the fiscal quarter ended September 30, 2018, the Company purchased 225,504 shares of its common stock for approximately $1,118,499, at an average price of $4.96 per share.

140.    As the Company's stock was actually worth only $0.17 per share, the price at closing on March 17, 2020, the Company overpaid by approximately $1,080,163 for repurchases of its own stock during the fiscal quarter ended September 30, 2018.

141.    According to the 2019 10-K, during the fiscal quarter ended December 31, 2018, the Company purchased 1,505,688 shares of its common stock for approximately $5,405,419, at an average price of $3.59 per share.

142.    As the Company's stock was actually worth only $0.17 per share, the price at closing on March 17, 2020, the Company overpaid by approximately $5,149,452 for repurchases of its own stock during the fiscal quarter ended December 31, 2018.

143.    According to the 2019 10-K, during the fiscal quarter ended June 30, 2019, the Company purchased 237,962 shares of its common stock for approximately $597,284, at an average price of $2.51 per share.

144.     As the Company's stock was actually worth only $0.17 per share, the price at closing on March 17, 2020, the Company overpaid by approximately $556,830 for repurchases of its own stock during the fiscal quarter ended June 30, 2019.

145.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $10.3 million.

## DAMAGES TO EXELA

146.     As a direct and proximate result of the Individual Defendants' conduct, Exela has lost and expended, and will lose and expend, many millions of dollars.

147.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its former CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

148.     These expenditures also include, but are not limited to, costs associated with the Restatement.

149.     Such losses include, but are not limited to, amounts that the Company overpaid, at the direction of the Individual Defendants, for the Company's repurchases of its own stock at artificially inflated prices.

150.     Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

151.     As a direct and proximate result of the Individual Defendants' conduct, Exela has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

152.    Plaintiff brings this action derivatively and for the benefit of Exela to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Exela, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

153.    Exela is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

154.    Plaintiff is, and has been continuously at all relevant times, a shareholder of Exela. Plaintiff will adequately and fairly represent the interests of Exela in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

155.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

156.    A pre-suit demand on the Board of Exela is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Cogburn, Reynolds, Chadha, Akins, and Rexford (the "Director-Defendants"), along with non-parties William Transier, J. Coley Clark, and Marc A. Beilinson (together with the Director-Defendants, the "Directors"). Plaintiff only needs to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

157.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while at the same time, eight of the Director-Defendants caused the Company to overpay for repurchases of its own stock, and one of the Director-Defendants engaged in insider sales based on material non-public information, all of which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

158.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

159.    Additional reasons that demand on Defendant Cogburn is futile follow. Defendant Cogburn has served as the Company's CEO and as a Company director since July 2017. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Cogburn with his principal occupation, and he receives handsome compensation, including $1,268,588 during fiscal 2019. Defendant Cogburn was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor

such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Cogburn is a defendant in the Securities Class Action. For these reasons, too, Defendant Cogburn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant Reynolds is futile follow. Defendant Reynolds served as the Company's CFO from July 2017 until he resigned on May 15, 2020, and has served as a Company director since July 2017. Defendant Reynolds has received and continues to receive handsome compensation from the Company, including $1,065,666 during fiscal 2018. Defendant Reynolds was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein. As one of the Company's highest officers and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Reynolds is a defendant in the Securities Class Action. For these reasons, too, Defendant Reynolds breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161.    Additional reasons that demand on Defendant Chadha is futile follow. Defendant Chadha has served as the Company's Executive Chairman and as a Company director since July 2017. He also serves as a member of the Company's Nominating and Corporate Governance Committee. Defendant Chadha has received and continues to receive compensation for his

positions with the Company as described above. Moreover, Defendant Chadha's beneficial stock ownership provides him with control of approximately 49.3% of total voting power over matters set for shareholder determination, making him a majority shareholder. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale, which yielded over $32.8 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. Furthermore, Defendant Chadha signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, too, Defendant Chadha breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Akins is futile follow. Defendant Akins has served as a Company director since July 2019. He also serves as a member of the Company's Nominating and Corporate Governance Committee. Defendant Akins has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Akins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Rexford is futile follow. Defendant Rexford has served as a Company director since July 2017. He also serves as a member of the Company's Compensation Committee and Audit Committee. Defendant Rexford has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Rexford signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, too, Defendant Rexford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    Additional reasons that demand on the Board is futile follow.

165.    Defendants Cogburn, Reynolds, Chadha, Black, Coburn, Lipman, Nord, and Rexford, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. These Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. For this reason, Defendants Cogburn, Reynolds, Chadha, Black, Coburn, Lipman, Nord, and Rexford breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

166.    As described above, Defendant Chadha directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Defendant Chadha received

proceeds of over $32.8 million as a result of an insider transaction executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to him, and excused.

167.    Demand in this case is excused because the Directors, five of whom are named as defendants in this action, are beholden to and controlled by Defendant Chadha, who controls the Company by virtue of his beneficial share ownership, which provided him with approximately 49.3% of total shareholder voting power as of June 5, 2020. These shareholdings provide Defendant Chadha with significant control over the continued employment of the Directors, and especially Defendant Cogburn, who derives his principal source of income from his position as the Company's CEO. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Chadha's control over them.

168.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Cogburn, Reynolds, and Chadha are each currently affiliated with HGM, which was founded by Defendant Chadha in 2001. Specifically, Defendant Chadha serves as HGM's CEO and Chief Investment Officer, Defendant Reynolds serves as HGM's Chief Operating Officer and as a Partner, and Defendant Cogburn serves as an advisor to HGM. Defendants Cogburn, Reynolds, and Chadha also each formerly served in a variety of senior positions at certain of Exela's predecessor entities, including SourceHOV and HOV Services, LLC. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

169.     Defendant Rexford served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the members of the Company's Audit Committee were responsible for overseeing, *inter alia*, the Company's accounting and financial reporting processes and the performance of the Company's internal audit function. Defendant Rexford failed to ensure the integrity of the Company's financial statements and internal controls, as he is charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. As such, Defendant Rexford breached his fiduciary duties, is not disinterested, and demand is excused as to him.

170.     In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

171.     Exela has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Exela any part of the damages Exela suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

172.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

173.    The acts complained of herein constitute violations of fiduciary duties owed by Exela's officers and directors, and these acts are incapable of ratification.

174.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Exela. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Exela, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

175.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Exela to sue the Individual Defendants named herein, since, if they

did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

176.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

177.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

179.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

180.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

181.    Under the direction and watch of the Directors, the 2018 and 2019 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company's financial data contained a host of serious errors related to the Company's liability in connection with the Appraisal Action, outsourced contract costs, expense reimbursements, revenue recognition, and classification of cash flows, among other things; (2) the foregoing errors negatively impacted the Company's reported revenue, operating loss, net loss, and basic and diluted loss per share; (3) due to the foregoing, the Company's consolidated financial statements for the fiscal years ended December 31, 2017 and December 31, 2018, as well as the Company's quarterly financial data for each fiscal quarter during fiscal 2018, and the first three fiscal quarters of fiscal 2019 would not be prepared in accordance with GAAP, and could not be relied upon; and (4) as a result, each of the Company's financial statements issued from March 2018 through November 2019 would ultimately need to be restated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

182.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to certain governance policies and procedures, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

183.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including election of directors, ratification of an independent auditor, advisory approval of executive compensation, and with respect to the 2018 Proxy Statement, advisory approval of the frequency of future advisory votes on executive compensation.

184.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Cogburn, Reynolds, Chadha, Black, Coburn, Lipman, Nord, and Rexford, which allowed them to continue breaching their fiduciary duties to Exela.

185.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

186.    Plaintiff on behalf of Exela has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

187.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188.    Defendants Cogburn, Reynolds, Chadha, Black, Coburn, Lipman, Nord, and Rexford (the "10b-5 Defendants") participated in a scheme to defraud with the purpose and effect of defrauding Exela. Not only is Exela now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Exela by the 10b-5 Defendants. With the price

of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the 10b-5 Defendants caused the Company to repurchase millions of its own shares on the open market at artificially-inflated prices, damaging Exela.

189.    During the Relevant Period, the 10b-5 Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

190.    The 10b-5 Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Exela not misleading.

191.    The 10b-5 Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the 10b-5 Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Exela.

192.    The 10b-5 Defendants acted with scienter, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The 10b-5 Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly

responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

193.    In addition to each of the 10b-5 Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

194.    By virtue of the foregoing, the 10b-5 Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

195.    Plaintiff on behalf of Exela has no adequate remedy at law.

### **THIRD CLAIM**

**Against Individual Defendants for Violations of Section 20(a) of the Exchange Act**

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.    The Individual Defendants, by virtue of their positions with Exela and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Exela and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Exela to engage in the illegal conduct and practices complained of herein.

198.    Plaintiff on behalf of Exela has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

199.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Exela's business and affairs.

201.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

202.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Exela.

203.    In breach of their fiduciary duties owed to Exela, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's financial data contained a host of serious errors related to the Company's liability in connection with the Appraisal Action, outsourced contract costs, expense reimbursements, revenue recognition, and classification of cash flows, among other things; (2) the foregoing errors negatively impacted the Company's reported revenue, operating loss, net loss, and basic and diluted loss per share; (3) due to the foregoing, the Company's consolidated financial statements for the fiscal years ended December 31, 2017 and December 31, 2018, as well as the Company's quarterly financial data for each fiscal quarter during fiscal 2018, and the first three fiscal quarters of fiscal 2019 would not be prepared in accordance with GAAP, and could not be relied upon; and (4) as a result, each

of the Company's financial statements issued from March 2018 through November 2019 would ultimately need to be restated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

204.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

205.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

206.   The Individual Defendants also breached their fiduciary duties by causing the Company to repurchase millions of shares of its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while one of them made a lucrative insider sale, netting proceeds of over $32.8 million.

207.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

208.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

209.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

210.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Exela has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

211.    Plaintiff on behalf of Exela has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

212.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Exela.

214.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Exela that was tied to the performance or artificially inflated valuation of Exela, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

215.   Plaintiff, as a shareholder and a representative of Exela, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

216.   Plaintiff on behalf of Exela has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

217.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

218.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

219.   In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

220.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

221.   Plaintiff on behalf of Exela has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Exela, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Exela;

(c)   Determining and awarding to Exela the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Exela and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Exela and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Exela to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Exela restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: July 8, 2020                      Respectfully submitted,

                                         **STECKLER GRESHAM COCHRAN PLLC**

                                          */s/ R. Dean Gresham*
                                         R. Dean Gresham
                                         12720 Hillcrest Road, Suite 1045
                                         Dallas, Texas 75230
                                         Telephone: (972) 387-4040
                                         Facsimile: (972) 387-4041
                                         Email: dean@sgc.law

                                         *Local Counsel for Plaintiff*

                                         **THE ROSEN LAW FIRM, P.A.**
                                         Phillip Kim
                                         275 Madison Avenue, 40th Floor
                                         New York, New York 10016
                                         Telephone: (212) 686-1060
                                         Facsimile: (212) 202-3827
                                         Email: pkim@rosenlegal.com

                                         **THE BROWN LAW FIRM, P.C.**
                                         Timothy Brown
                                         240 Townsend Square
                                         Oyster Bay, NY 11771
                                         Telephone: (516) 922-5427
                                         Facsimile: (516) 344-6204
                                         Email: tbrown@thebrownlawfirm.net

                                         *Counsel for Plaintiff*

DocuSign Envelope ID: A87E58A2-1EE2-4DF0-A48F-05B7EA6879E6

## **VERIFICATION**

I,    Gregory McKenna    am    a plaintiff the    within    action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2020.

7/7/2020

Gregory McKenna